UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHERYL SATTERTHWAITE, AS EXECUTRIX OF THE ESTATE OF DENNIS SATTERTHWAITE, )<br><br>Plaintiff )<br><br>v. )<br><br>UNITED STATES OF AMERICA, UHS OF WESTWOOD PEMBROKE, INC., ARTHUR N. PAPAS, M.D. AND CATHERINE SULLIVAN, R.N.C., )<br><br>Defendants ) | NO. 05-10606-WGY |

**JOINT PRETRIAL MEMORANDUM PURSUANT TO LOCAL RULE 16.5**

I.    **CONCISE SUMMARY OF EVIDENCE**

   A.    **Plaintiff's Concise Summary of Evidence**

   This is a wrongful death medical malpractice action arising from the suicide of the plaintiff's decedent, Dennis Satterthwaite, a 49 year old father of two.

   On April 28, 2002, Mr. Satterthwaite was taken to the Jordan Hospital Emergency Room by his elderly father for evaluation of depression with suicidal ideation with a concrete plan. Mr. Satterthwaite was legally separated from his wife and had a history of depression, but had no previous psychological hospitalization and no previous suicide attempts. He was evaluated and immediately sent to McLean Hospital on that day for inpatient hospitalization. He was discharged from McLean Hospital on May 6, 2002 to the partial hospitalization program at Westwood Lodge Hospital Day Program for ongoing treatment.

   At Westwood Lodge, Mr. Satterthwaite received group, individual, marital and

pharmacological therapy.  His treating psychiatrist was the defendant, Arthur Papas,

M.D., and his treating psychiatric nurse was the defendant, Catherine Sullivan, R.N.C.

In the days prior to his discharge from the program, the medical records indicate that

Mr. Satterthwaite was still thinking about suicide and that his condition was worsening.

On May 21, 2002, two days prior to his scheduled discharge from the Westwood Lodge

program, Mr. Satterthwaite disclosed his suicidal plan to slit his own throat with a knife

to the defendant, Catherine Sullivan, R.N.C., and his wife during a couples only

meeting.  Upon Nurse Sullivan informing him of this episode, Dr. Papas was concerned

of Mr. Satterthwaite's risk for suicide and performed a one on one evaluation and

assessment of Mr. Satterthwaite.  Despite this episode, neither Dr. Papas nor Nurse

Sullivan made any changes to Mr. Satterthwaite's treatment plan.

On May 23, 2002, Mr. Satterthwaite was discharged from the Westwood Lodge

program by Dr. Papas in accordance with the original treatment plan created on May

7th.  The discharge treatment plan initiated by Dr. Papas called for Mr. Satterthwaite to

attend outpatient therapy with Robert Lasky, M.D. for his psychiatric condition.  Nurse

Sullivan's discharge plan instructed Mr. Satterthwaite to call or return to Westwood

Lodge should he require more help.

One day later, on May 24, 2002, Mr. Satterthwaite called Nurse Sullivan

complaining of increasing depression since his discharge and stating that he did not

want to work.  Nurse Sullivan instructed Mr. Satterthwaite to go to work and adhere to

his treatment plan, but she neither made a note of this conversation nor informed any of

the medical staff at Westwood Lodge about it.  According to the Department of Mental

Health's (DMH) investigation report, Mr. Satterthwaite saw Dr. Lasky on May 24, 2002

as scheduled.  At this time, Dr. Lasky found Mr. Satterthwaite to be unstable and

recommended he return to Westwood Lodge for an evaluation.  (The treatment note for

this visit has been misplaced by Dr. Lasky's employer).  Mr. Satterthwaite presented to

Westwood Lodge and was seen by Westwood Lodge staff that evening.  The Westwood

Lodge staff did not admit Mr. Satterthwaite and did not make any adjustments to his

medication or treatment plan, but told him that he could return to Westwood Lodge if

necessary.

The very next day, on May 25, 2002, Mr. Satterthwaite called ACCES, a toll free

number used to gain admission to Westwood Lodge.  His call was transferred to Arbour

Hospital, which took Westwood Lodge's off hours and weekend calls, and he spoke with

Monica Gordon, an employee of the defendant, UHS of Westwood Pembroke, Inc.

(UHS).  According to Ms. Gordon's record of this conversation and the DMH report, Mr.

Satterthwaite expressed suicidal ideation during this call.  Ms. Gordon erroneously

informed Mr. Satterthwaite that he needed to first go to an emergency room for medical

clearance before he could be evaluated at Westwood Lodge and offered no additional

help.  Following this phone conversation, Ms. Gordon called Westwood Lodge.  She

informed the staff at Westwood Lodge of her conversation with Mr. Satterthwaite and

stated that Mr. Satterthwaite may present to Westwood Lodge despite her instructions.

Later that day, Mr. Satterthwaite did present to Westwood Lodge seeking an

evaluation and/or admittance.  The written and stated policy of Westwood Lodge at that

time required a walk-in patient such as Mr. Satterthwaite who was exhibiting signs of

psychiatric problems to complete an Assessment Information Form followed by a

clinician performing an assessment.   Despite this established policy of Westwood

Lodge, Elizabeth Condron, R.N., the nursing supervisor on duty at Westwood Lodge

and an employee of UHS/Westwood Lodge, denied Mr. Satterthwaite admittance to

Westwood Lodge, failed to perform any assessment of Mr. Satterthwaite and informed Mr. Satterthwaite to go to the emergency room at Norwood Hospital to be evaluated. In short, she would not even let him enter the building, but did suggest that he try back "after 3:00 pm" when a new supervisor would take over. Mr. Satterthwaite returned to Westwood Lodge later that day and again asked for help. Nurse Condron again failed to perform an assessment of Mr. Satterthwaite and UHS/Westwood Lodge employee Sadie Anne Maroon again erroneously informed Mr. Satterthwaite that he needed to be evaluated at an emergency room prior to being evaluated at Westwood Lodge. He was sent away for a second time without being allowed to enter the building.

On May 28, 2002, Mr. Satterthwaite, a veteran of the first Gulf War, presented to the Boston VA Clinic where he was seen by John Randolph, Ed.D., a licensed psychologist. At this time, Mr. Satterthwaite was complaining of suicidal ideation and fears that he couldn't cope. According to Dr. Randolph's records, Mr. Satterthwaite told him of his prior attempts to acquire readmission to an inpatient psychiatric facility. During his evaluation, Dr. Randolph called and spoke with Nurse Sullivan on the phone. Nurse Sullivan told Dr. Randolph that Mr. Satterthwaite seemed like "he'd like to live in the hospital, use it as a retreat." At this time, Nurse Sullivan claims to have had no contact with Mr. Satterthwaite in four days and claims she was unaware of his repeated attempts to seek admission to Westwood Lodge during that time. Dr. Randolph testified that he had safety concerns for Mr. Satterthwaite's suicide risk during this evaluation. Despite these concerns, Dr. Randolph did not recommend admitting Mr. Satterthwaite and also did not advise any further treatment besides the continuation of Mr. Satterthwaite's out patient treatment plan that was outlined on May 7, 2002.

On his 49th birthday, May 30, 2002, Mr. Satterthwaite was found dead in the

rooming house he was living in by the Quincy Police. He had committed suicide by hanging himself from a pipe in his room. Mr. Satterthwaite's wife, Sheryl Satterthwaite, brings this wrongful death action on behalf of her two daughters, Renee, age 24, and Lauren, age 20. Although their relationship with their father had been strained for many years due to his mental illness, the defendants' negligence has deprived Renee and Lauren of the opportunity to be with their father and deprived them of the opportunity to have a closer relationship once his illness was properly treated.

### B.    Defendant, United States of America's Concise Summary of Evidence

Defendant, United States, will show through medical records, the Testimony of Dr. Randolph, and through expert testimony, that Mr. Satterthwaite presented to the VA walk-in clinic for a single visit on May 28, 2002, and that Dr. Randolph provided Mr. Satterthwaite a thorough evaluation for his presentation that was fully within the standard of care for such an evaluation. The U.S. will further show through the evidence that Dr. Randolph made a well reasoned and independent conclusion that at the time of his walk-in visit Mr. Satterthwaite was stable, not a danger to himself and not in need of re-hospitalization. Finally, the U.S. will show through the evidence that Dr. Randolph offered follow-up VA services to Mr. Satterthawaite if he needed them either on an emergency basis or an ongoing treatment basis.

### C.    Defendants, UHS of Westwood Pembroke, Inc. and Catherine Sullivan, R.N.C.'s Concise Summary of Evidence

The Defendants, UHS of Westwood Pembroke, Inc., and Catherine Sullivan, RN expect the evidence will show that at all times the care and treatment provided to Dennis Satterthwaite during his admission to the Partial Hospital Program at Westwood Lodge in May 2002 was appropriate and complied with the standard of care. More

specifically, the defendants expect the evidence will show that Mr. Satterthwaite was appropriately referred to Westwood Lodge for a lower level of care on May 6, 2002 when he was discharged from the in-patient unit at McLean Hospital.  An initial comprehensive assessment and evaluation was conducted by Cathy Sullivan, RN, and by other members of Mr. Satterthwaite's treatment team at the Partial Hospital Program. The Defendants expect the evidence will show that Ms. Sullivan had nineteen years of experience as a registered nurse in a psychiatric setting.

After the initial assessment, a treatment plan was established with Mr. Satterthwaite, which included group, medical and psychopharmacological therapy.  Mr. Satterthwaite attended the program on a regular basis from 9 –5. When he was not attending the program, the evidence will show he was transitioning back to his job at the United States Postal Service.

The Defendants further expect that the evidence will show that Ms. Sullivan complied with the standard of care of the average qualified psychiatric nurse when she coordinated a meeting with Mrs. Satterthwaite and Mr. Satterthwaite.   The break-up of his marriage and the lack of contact with his daughters were reported to be major stressors for him and frequent topics of his therapy. During the couples meeting, Mrs. Satterthwaite agreed to maintain contact with her husband although she admitted their daughters did not want him to return home or to have contact with him.

The Defendants expect the evidence will show that Ms. Sullivan appropriately followed up with Mr. Satterthwaite when he referenced a suicidal gesture during the couples meeting.  He denied any intention to follow through with the gesture.  In addition, Ms. Sullivan appropriately reported the comment and gesture to Dr. Papas, Mr. Satterthwaite's Attending psychiatrist, who also discussed it with Mr. Satterthwaite

before he was discharged from the Partial Hospital Program. Further, the evidence will show that Mrs. Satterthwaite, who had known her husband for twenty-one years, did not object to his discharge.

The Defendants further expect the evidence will show that Mr. Satterthwaite's discharge from the Partial Hospital Program on May 23, 2002 was appropriate. At that time, he was ready for and agreed to a lower level of care, to return to work on a full time basis, and to continue his therapy on an out-patient basis. The issues with his wife and children, which were the primary focus of his Partial Hospital Program, were long-term issues, without any quick resolution. The staff at the Partial Hospital Program had made appropriate arrangements for Mr. Satterthwaite to return to out-patient providers, who he had seen prior to his admission at McLean's Hospital. The evidence will show that Mr. Satterthwaite understood and agreed with the discharge plan, as he kept his appointment with his out-patient provider Dr. Lasky on May 24, 2002.

Similarly, he returned to the Westwood Lodge Hospital on Friday, May 24, 2002 for another evaluation, as he had been told he could do by Cathy Sullivan, RN at the time of his discharge. The evidence will show that a thorough assessment and evaluation was conducted by Patricia Loughman-West and Dr. Ashraf Attalla, both experienced mental health practitioners. The evidence will show that Mr. Satterthwaite was not committable under M.G.L. c. 123, section 12. Rather the evidence will show that he had friends in the community and his father who would be with him and in contact with him over the week-end. The evidence will also show that attempts were made to reach Dr. Lasky, but that he did not return any of the calls. The evidence will show that Mr. Satterthwaite agreed with the plan established by Ms. Loughman-West and Dr. Attalla.

In addition, the Defendants expect the evidence will show that on Saturday, May 25, 2007, Sadie Ann Maroon, a mental health clinician, and Elizabeth Condron, RN, reasonably relied on the information they received from Monica Gordon, an ACCES clinician at The Arbour Hospital. The evidence is expected to show that how the ACCES program was established to coordinate mental health assessments and admissions, as will as its guidelines and procedures with respect to patients who called the ACCES telephone line seeking care at Arbour Health System hospitals.

The Defendants expect the evidence will show that Mr. Satterthwaite was not evaluated at Westwood Lodge on Saturday, May 25, 2002, and that he chose not to go to the emergency department at either Norwood Hospital or Jordan Hospital, where his father had taken him prior to his admission to McLean Hospital. Instead the evidence will show that Mr. Satterthwaite spent the week-end with his father playing checkers and walking on the beach. The evidence is further expected to show that he had a telephone conversation with Sheryl Satterthwaite in the evening of Sunday, May 26, 2002, and she felt overwhelmed and decided to back away. This was the last time Mrs. Satterthwaite had contact with her husband.

Further, the evidence will show that the Defendant Catherine Sullivan appropriately spoke with the Co-defendant John Randolph, Ed.D., during his evaluation of Mr. Satterthwaite on Tuesday May 28, 2002. Ms. Sullivan appropriately gave her clinical impressions of Mr. Satterthwaite during his attendance at the Partial Hospital Program, but with the proviso that since Mr. Satterthwaite was there with him, Dr. Randolph had the opportunity to assess his present mental state. The evidence is expected to show that since Mr. Satterthwaite was no longer a patient of the Partial Hospital Program, the standard of care did not require Ms. Sullivan to document her

8

conversation with Dr. Randolph.

Finally, the Defendants expect the evidence will show that nothing Catherine Sullivan, RN or that any of the other agents, servants, or employees of UHS of Westwood Pembroke, Inc., did or allegedly failed to do, was a substantial contributing cause of Mr. Satterthwaite's suicide or the plaintiff's damages. The Defendants expect the evidence will show that Mr. Satterthwaite's suicide on May 30, 2002 was not foreseeable or predictable. It is purely speculative to assume that had Mr. Satterthwaite been assessed on May 25, 2002 that he would have been admitted or that he would have met the criteria for in-patient admission.

### D.    Defendant, Arthur N. Papas' Concise Summary of Evidence

The defendant, Dr. Papas, anticipates the evidence will show that he was involved in the care and treatment of Dennis Satterthwaite during his admission to the partial hospital program at Westwood Lodge from May 7 to May 23, 2002. Dr. Papas' first encounter with the patient was on May 7, for an initial evaluation. Dr. Papas elicited a lengthy history from the patient, including the patient's recent admission to McLean Hospital, as documented in his note. Dr. Papas performed a suicide risk assessment, and the patient denied suicide ideation, plan or intent. Based upon Dr. Papas' initial assessment of the patient, he documented the following diagnoses: Axis I – major depression with mood congruent features; Axis II – obsessive compulsive personality; Axis III – no diagnoses; Axis IV – severe; marital conflict; marital separation; living alone; Axis V – GAF 40-50. Dr. Papas reviewed the patient's medications ordered on discharge from McLean Hospital, Luvox 50 mg at bedtime and Risperdal 1.5 mg at bedtime. Dr. Papas continued the Luvox and increased the Risperdal to 2 mg.

The evidence will show that Dr. Papas reviewed and signed the Outpatient

9

Medical Screening/Nursing Assessment and Interdisciplinary Treatment Plan, which were completed by Cathleen Sullivan, R.N.

The evidence will show that Dr. Papas' next involvement with the patient was on May 10, for an individual therapy session.  The patient reported that he was doing pretty well.  Dr. Papas discussed with the patient his recent discussions with his wife regarding returning to their home, his having dinner with friends the night before the visit, and his plans for the weekend.  Dr. Papas noted the patient was calm, but sensitive and embarrassed by his urges and his life.  Dr. Papas noted that the patient had not increased the Risperdal to 2 mg.  The plan for the patient included continuing Luvox and increasing the Risperdal to 2 mg at bedtime.

The evidence will show that Dr. Papas' next individual therapy session with the patient was on May 15, 2002.  Dr. Papas discussed with the patient his work and his appointment with Dr. Robert Lasky at Nova Psychiatric.  Dr. Papas discussed with the patient his anxiety over the past few weeks, and the patient's plan to meet with a social worker along with his wife the following week.  They discussed that the patient's wife cared about him, but did not love him at that time.  The patient reported that he loved his wife and daughters, and would tell them that he loved them.  He reported that he wanted to be with his wife and daughters again.  Dr. Papas also discussed with the patient his reading of the New Testament, as well as his unhappiness with the way his daughters dressed.  Dr. Papas' plan for the patient included continuing Luvox and continuing Risperdal 2 mg at bedtime.

The evidence will show that Dr. Papas next saw the patient for an individual therapy session on May 20, 2002.  The patient reported weeping and crying over the weekend.  He reported feeling depressed and rejected by his family.  He indicated that

he plan to get together with his 15 year-old daughter.  Dr. Papas discussed with the patient his asking to return to the family home, and being told that the family was not ready to have him back.  Dr. Papas noted the patient had akathisia, a side effect of psychotropic medications, and prescribed to the patient Inderal 20 mg three times per day.  The plan also included increasing the patient's Luvox to 100 mg by mouth at bedtime and increasing the Risperdal to 3 mg at bedtime.

The evidence will show that Dr. Papas saw the patient the following day, May 21, 2002, for an individual therapy session.  Dr. Papas noted that the patient had had a couples meeting with Nurse Sullivan and the patient's wife, during which the patient disclosed a plan to slit his throat.  Dr. Papas discussed with the patient his collection of knives kept at his home, which he had collected over the years.  The patient contracted for safety, and reported that he would not use any of his knives to harm himself.  The patient stated that he would throw some of the knives away.

The evidence will show that during this session, Dr. Papas evaluated the patient's affect, finding him to be calm, composed and on the flat side.  The patient spoke clearly and directly.  He reported crying two times on Sunday.  He cried and sobbed with a male friend, and told his friend how he was feeling, including thinking of suicide and being desperate and sad.  This friend consoled the patient, and told him to look to Jesus to help him.  Dr. Papas also discussed the patient's living arrangements, and the patient possibly living with his father.  The patient also reported that his wife wanted to see him get better, and that reconciliation could occur when he got better. The plan included continuing the patient's medications.

The evidence will show that Dr. Papas saw the patient the following day, May 22, 2002, for an individual therapy session.  The patient reported feeling over sedated, and

Dr. Papas noted that the patient's responses were slowed. Dr. Papas discussed with the patient his discharge, and suicidality. The patient reported that he would not attempt suicide, and contracted for safety if discharged. They discussed that the patient spoke with his father, who welcomed him in and told the patient that he loved him. Dr. Papas noted that the patient smiled and was pleased about this. The plan included reducing the Risperdal to 2 mg at bedtime in light of the patient's feeling over sedated, and continuing the Luvox and Inderal.

The evidence will show that the patient was discharged from the partial hospital program on May 23, 2002. Dr. Papas dictated a discharge summary. The patient's diagnoses on discharge were as follows: Axis I – Major depression, with mood congruent features. Obsessive compulsive disorder; Axis II – Obsessive compulsive personality; Axis III – No diagnosis; Axis IV – Severe; marital separation and estrangement from daughters; Axis V – GAF Scale Rating on discharge 60. The discharge plan included outpatient care with Rochelle Cooper, CNS and Dr. Robert Lasky, of NOVA Psychiatrists. The patient was also invited to attend the Transitional Group in the Adult Partial Program at Westwood Lodge. The patient's medications on discharge were Luvox 100 mg at bedtime, Risperdal 2 mg at bedtime and Inderal 20 mg three times per day. Prior to the patient's discharge, Dr. Papas conducted a suicide risk assessment. On questioning the patient denied suicidal ideation or threat. The patient contracted for safety, and contracted to return if he did not feel safe.

The evidence will show that Dr. Papas had no further involvement with the patient following the discharge on May 23, 2002.

The defendant expects the evidence will show that his care and treatment of Dennis Satterthwaite met the standard of care and skill required of the average qualified

psychiatrist practicing in 2002. The defendant further expects the evidence will show that nothing he did or allegedly failed to do caused or contributed to cause any injury to Dennis Satterthwaite, including Mr. Satterthwaite's death.

II.    **FACTS ESTABLISHED BY PLEADING OR BY STIPULATIONS OR ADMISSION OF COUNSEL**

The parties agree to the following facts:

1)    On April 28, 2002, Mr. Satterthwaite was a patient at the Jordan Hospital

2)    From April 28, 2002 through May 6, 2002, Dennis Satterthwaite was an inpatient at McLean Hospital.

3)    From May 7, 2002 through May 23, 2002, Dennis Satterthwaite was a patient in the partial hospitalization program at Westwood Lodge Hospital.

4)    The defendant, Arthur Papas, M.D., rendered care to Dennis Satterthwaite while Mr. Satterthwaite was a patient in the partial hospitalization program at Westwood Lodge Hospital.

5)    The defendant, Catherine Sullivan, R.N.C., was an employee of the defendant, UHS of Westwood Pembroke, Inc., at all relevant times who rendered care to Dennis Satterthwaite while Mr. Satterthwaite was a patient in the partial hospitalization program at Westwood Lodge Hospital.

6)    At all relevant times, Elizabeth Condron, R.N., was an employee of the defendant, UHS of Westwood Pembroke, Inc.

7)    At all relevant times, Sadie Anne Maroon was an employee of the defendant, UHS of Westwood Pembroke, Inc.

8)    At all relevant times, Karen Braunwald, M.D. was an employee of the defendant, UHS of Westwood Pembroke, Inc.

9)    At all relevant times, John Randolph, Ed.D. was an employee of the

defendant, United States of America.

10) On May 30, 2002, Dennis Satterthwaite committed suicide by hanging.

## III.   CONTESTED ISSUES OF FACT

The parties contest whether the treatment and care the defendants and their agents, servants and/or employees rendered to the plaintiff's decedent, Dennis Satterthwaite, was negligent, whether the defendants and their agents, servants and/or employees complied with the standard of care, and whether any negligence by the defendants and their agents, servants and/or employees was a substantial contributing cause of Mr. Satterthwaite's suicide.  The parties also contest the amount of the plaintiff's damages.

## IV.   JURISDICTIONAL QUESTIONS

None that the parties are aware of at this time.

## V.   QUESTIONS RAISED BY PENDING MOTIONS

The parties are currently awaiting the production of documents from the Internal Revenue Service and several of Dennis Satterthwaite's health care providers in response to motions filed by the defendants, UHS of Westwood Pembroke, Inc. and Catherine Sullivan, R.N.C.  The parties may have objections to the introduction of these documents into evidence once the parties have received and reviewed them.

## VI.   ISSUES OF LAW

a.   Defendants, UHS of Westwood Pembroke, Inc. and Catherine Sullivan, anticipate filing a Motion to Dismiss the gross negligence claims against them, as there is no evidence to support such a finding.

b.   Defendants, UHS of Westwood Pembroke, Inc. and Catherine Sullivan, anticipate filing a Motion in Limine to exclude the Department of Mental Health's

investigative report, notification, and decision letter from being admitted into evidence, as they contain inadmissible hearsay and include findings regarding the ultimate conclusion in this case.

**VII.    REQUESTED AMENDMENTS TO THE PLEADINGS**

None.

**VIII.    ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION**

The parties are scheduled to attend a mediation hearing before Magistrate Judge Marianne B. Bowler on May 18, 2007. This hearing was originally scheduled to take place on April 19, 2007, was rescheduled by the court for April 20, 2007 and then rescheduled yet again due to the unavailability of the parties.

The parties anticipate the need for the filing of motions in limine with regard to evidentiary matters. Therefore, the parties request a hearing prior to the start of trial during which the motions in limine can be heard and decided by the Court.

**IX.    PROBABLE LENGTH OF TRIAL**

8 to 10 trial days.

**X.    WITNESS LIST**

1.    Sheryl Satterthwaite (Factual)
       58 Highland Road
       Abington, MA
       781-871-5106

2.    Renee Satterthwaite (Factual)
       58 Highland Road
       Abington, MA
        781-871-5106

3.    Lauren Satterthwaite (Factual)
       58 Highland Road
       Abington, MA
       781-871-5106

4.     Arthur Papas, M.D. (Factual/Medical)
       5 Byron Road
       Weston, MA

5.     Catherine Sullivan, R.N. (Factual/Medical)
       36 Grandfield St.
       Dedham, MA

6.     John Randolph, Ed.D. (Factual/Medical)
       43 Starbird Street
       Malden, MA

7.     Amy Mach (Factual)
       22 State Street, Apt. 6
       Taunton, MA

8.     Elizabeth Condron, R.N. (Factual/Medical)
       96 Main Street
       Foxborough, MA

9.     Patricia Loughman-West (Factual/Medical)
       49 Sunrise Road
       Westwood, MA
       781-551-3892

10.    Karen Braunwald, M.D. (Factual)
       28 Brooks Road
       Wayland, MA

11.    Valerie Packard, R.N. (Factual)
       302 Walpole Street
       Norwood, MA

12.    Sadie-Anne Maroon (Factual)
       401 Belmont Street
       Brockton, MA

13.    Monica Gordon (Factual)
       4 Marcella Street
       Roxbury, MA

14.    David Marinelli (Factual - if needed)
       138 Utica Street, Apt. 4
       Quincy, MA

15.    Kimlisa Gregory (Factual)
       54 Central Avenue
       Hull, MA

781-248-7078

16. Marc Silbret, M.D. (Factual/Medical - if needed)
McLean Hospital
115 Mill Street
Belmont, MA 02478

17. Mark Longsjo, L.I.C.S.W. (Factual/Medical - if needed)
McLean Hospital
115 Mill Street
Belmont, MA 02478

18. Sgt. J. Sullivan (Factual - if needed)
Quincy Police Department
1 Sea Street
Quincy, MA 02169
Hull, MA

19. Norman Satterthwaite (Factual - By deposition if needed)
Pinehurst Village
12 Bayberry Lane
Plymouth, MA

20. Ashraf Attala, M.D. (Factual/Medical)
4015 South Cobb Drive, #100
Smyrna, GA
(770) 319-8103

21. Reverend Michael Cox (Factual)
Tri-Town Baptist Church
28 Bay Avenue East
Hull, MA
781-925-9423

22. Donna Parkki (Factual)
252 Billings Road
Quincy, MA
617-786-8999

23. George Smith (Factual)
Arbour Hospital
49 Robinwood Avenue
Boston, MA

24. Larry S. Kirstein, M.D. (Plaintiff's Expert)
903 Park Avenue
Suite 2C
New York, New York 10021

212-737-0999

25.   Christina Gulliver, RN, BSN, ANP (Plaintiff's Expert)
      13 Exeter Farms Road
      Exeter, NH 03833
      617-726-7705

26.   Richard J. Frances, M.D., F.A.C.P., F.A.P.A. (Defendant, U.S.A.'s Expert)
      510 East 86th Street, Apt. 1D
      New York, NY 10028
      212-861-0570

27.   Michael Jenike, M.D. (Defendant, Arthur N. Papas, M.D.'s Expert)
      Massachusetts General Hospital
      Simches Research Building
      185 Cambridge Street
      Boston, MA 02114
      (617) 726-6766

28.   Mary Wright, APRN, BC, MPH (Defendants, UHS and Catherine Sullivan, RNC's Expert)
      25 Andrew John Street
      Boston, MA

29.   Jonathan Chasen, M.D. (Defendants, UHS and Catherine Sullivan, RNC's Expert)
      236 Crestview Circle
      Longmeadow, MA

30.   Douglas Jacobs, M.D. (Defendants, UHS and Catherine Sullivan, RNC's Expert)
      Professional Psychiatric Associates
      One Washington Street, Suite 304
      Wellesley Hills, MA

## XI.   PROPOSED EXHIBITS

**Agreed:**

1.   Emergency Room Records, Jordan Hospital, 4/28/02

2.   McLean Hospital Records, 4/28 – 5/6/02

3.   Westwood Lodge Hospital Partial Hospitalization Program Records, 5/7/02 – 5/23/02

4.   Westwood Lodge Intake Evaluation Records, 5/24/02

5.    Arbour Health System Intake Call Sheet, May 25, 2002

6.    Nova Psychiatric Services Bills, 9/6/00 and 5/24/02

7.    Boston VA Records, 2/12/96 – 6/17/02

8.    Death Certificate of Dennis Satterthwaite

9.    Quincy Police Department Death Scene Report, 5/30/02

10.   Policies and Procedures of Westwood Lodge Hospital and the Arbour
      Hospital System Produced by the defendant, UHS of Westwood
      Pembroke, Inc. on October 11, 2006

**Disputed:**

A.    Policies and Procedures of Westwood Lodge Hospital and the Arbour
      Hospital System Produced by the Department of Mental Health:

      i.     Arbour Hospital Intake Procedures for U.H.S. of
             Westwood/Pembroke, Effective Date 3/00;

      ii.    Arbour Hosital Admission Procedure, Policy Number 2.2.2,
             Effective Date 9/1/95, Reviewed Date, 11/1/01;

      iii.   Westwood Pembroke Health System Intake and Assessment
             Process, Department, Partial Hospitalization, Effective Date, 7/1/05,
             Reviewed 11/12/01;

      iv.    Westwood Pembroke Health System Referral to the ACCESS,
             Department, Access Effective Date 4/93, Reviewed Date 5/95;

      v.     Westwood Pembroke Health System Client Eligibility, Department,
             Access, Effective Date 4/93, reviewed Date 5/95;

      vi.    Westwood Pembroke Health System Disposition of Scheduled
             Walk-In Assessment, Department, Access, Effective Date, 5/84,
             Reviewed Date, 9/1/95 and 11/1/01;

      vii.   Westwood Pembroke Health System Voluntary and Involuntary
             Admissions, Clinical Services, Policy Number, RI0008, Date Issued
             1/98;

      viii.  Westwood Pembroke Health System Admission Procedure, Clinical
             Services, Policy Number, TX.001, Date Issued 1/98, Date
             Reviewed/Revised 11/01;

      ix.    Westwood Pembroke Health System Interdisciplinary Treatment

Plan, Clinical Services, Policy Number, CS 018, TX.004, Date Issued 12/13/96, Date Reviewed/Revised 1/98 and 11/01;

x.      Westwood Pembroke Health System Interdisciplinary Treatment Plan Partial Hospitalization, Clinical Services, Policy Number CS 027-PHP TX.005, Date Issued 8/97, Date Reviewed/Revised 11/01;

xi.     Westwood Pembroke Health System Treatment Planning Intensive Outpatient Program Clinical Services, Policy Number TX.006, Date Issued 1/98, Date Reviewed/Revised 11/01;

xii.    Westwood Pembroke Health System Discharge Discharge/Aftercare Planning, Clinical Services, Policy Number CS 017, CC.010, Date Issued 12/13/96, Date Reviewed/Revised 1/98 and 11/01;

xiii.   Westwood Pembroke Health System Discharge Process, Clinical Services, Policy Number CC.011, Date Issued 1/99, Date Reviewed/Revised 11/01

B.   6/26/02 Letter from Karen Braunwald, Ph.D. to Robert Spiegel, CEO

C.   Blue Cross and Blue Shield Service Benefit Plan, 2002

D.   Department of Mental Health Investigation Report, 9/10/02

E.   Interview Notes of Amy Mach, Department of Mental Health investigator

F.   Assorted journals of Dennis Satterthwaite

G.   Copy of Dennis Satterthwaite's May 2002 records from the Employee Assistance Program of the United States Postal Service

H.   Copy of correspondence to and from Dennis Satterthwaite from the Internal Revenue Service regarding any unpaid taxes, penalties, and late fees from the year 2002

I.   Good Shepherd's Maria Droste Services Records for Dennis Satterthwaite

J.   Jon J. Pehrson, M.D.'s Medical Records for Dennis Satterthwaite

K.   Massachusetts State Police Report. Dated June 10, 2002

L.   Westwood Lodge Hospital Nursing Supervisor Book

M.   Copy of the Clinical Services policies for the Partial Hospitalization Program which were in effect at Westwood Lodge in 2002

N.    Copy of the State Police report regarding Dennis Satterthwaite's death, dated June 10, 2002

## XII.    REMAINING OBJECTIONS AS TO PRETRIAL DISCLOSURE REQUIRED BY FED. R. CIV. P. 26(a)(3)

The plaintiff objects to the defendant, UHS of Westwood Pembroke, Inc.'s stated intention to call two psychiatrists to testify as experts at the time of trial. Plaintiff seeks to limit the scope of each expert's testimony so as to not have duplicative expert opinions and testimony of the same issues. The plaintiff further objects to the defendant, UHS of Westwood Pembroke, Inc. and Catherine Sullivan, R.N.C.'s intention to call George Smith of Arbour Hospital as a witness at trial. Neither UHS of Westwood Pembroke, Inc. nor Catherine Sullivan, R.N.C. have previously disclosed Mr. Smith as a person having likely to have discoverable information pursuant to F.R.C.P. 26(a)(1) or in response to interrogatories propounded by the plaintiff, nor have either of these defendants provided any summary concerning the area and scope of Mr. Smith's expected testimony.

The Defendants, UHS of Westwood Pembroke, Inc., and Catherine Sullivan, RN disagree with the plaintiff's contention that the expected testimony of Dr. Douglas Jacobs and Dr. Jonathan Chasen is cumulative. The expected disclosures specifically outline the scope of each of their expected opinions.

PLAINTIFF

Sheryl Satterthwaite

By her Attorneys

SUGARMAN & SUGARMAN, P.C.


/s/ David P. McCormack
Jodi M. Petrucelli – BBO# 561911
David P. McCormack – BBO# 659006
One Beacon Street
Boston, MA 02108
(617) 542-1000
jpetrucelli@sugarman.com
dmccormack@sugarman.com

DEFENDANTS

Universal Health Services, Inc. and
Catherine Sullivan, R.N.C.

By their Attorneys

HUNTER & BOBIT, P.C.


/s/ Amy DeLisa
Janet Bobit
Amy DeLisa
83 Atlantic Avenue
Boston, MA 02108
(617) 371-1440
jjbobit@hunterbobit.com
adelisa@hunterbobit.com

DEFENDANT

United States of America

By its Attorneys

UNITED STATES ATTORNEY'S OFFICE

/s/ Anton Giedt
Anthon Giedt
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3969
anton.giedt@usdoj.gov

DEFENDANT

Arthur Papas, M.D.

By his Attorneys

SLOANE & WALSH

/s/ Stacey Morris
James P. Donohue, Jr.
Stacey Morris
Three Center Plaza
Boston, MA 02108
(617) 523-6010
jdonohue@sloanewalsh.com
smorris@sloanewalsh.com